**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**EDWARD HAGOOD,**

        **Plaintiff,**

**v.**

**PORTFOLIO RECOVERY**
**ASSOCIATES, LLC,**

        **Defendant.**

Case No. 3:18-CV-1510-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the cross-motions for summary judgment filed by Defendant Portfolio Recovery Associates, LLC ("PRA") (Doc. 36) and Plaintiff Edward Hagood (Doc. 46), the parties' Stipulation to certain facts (Doc. 33), PRA's Motion to Exclude Plaintiff's Expert Witness (Doc. 39), and Hagood's Motion to Strike portions of PRA's summary judgment evidence (Doc. 50). For the reasons set forth below, PRA's motion to exclude Plaintiff's expert and motion for summary judgment are granted, Hagood's motion for summary judgment is denied, and his motion to strike is denied as moot.

### INTRODUCTION

Plaintiff Edward Hagood filed this case on August 17, 2018, to enforce the consumer privacy provisions of the Telephone Consumer Protection Act (TCPA) (Doc. 1). Hagood alleges PRA—a debt collector—violated the TCPA by calling his cell phone using a predictive dialer without his consent.

Hagood was notified by the MDL class action administrator in *In re Portfolio Recovery Associates, LLC. Telephone Consumer Protection Act Litigation*, No. 11-MD-2295-JAH-BGS, that he was a potential class member in that action. The parties in the Portfolio Recovery MDL Class Action entered into a court-approved settlement agreement, of which Hagood opted out (*Id.*). He now brings this individual action in an attempt to recover damages.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not genuinely disputed for purposes of summary judgment. In May 2009, PRA purchased a Citibank Bank debt portfolio and a Capital One Bank debt portfolio that included accounts held by Hagood (Doc. 36-2; Doc. 43). After the acquisition of Hagood's accounts, PRA began efforts to collect the outstanding balances.

In connection with its purchase of the portfolio containing Hagood's Citibank account, PRA received Hagood's telephone number ending in -8643 (Doc. 36-2). PRA received that phone number through the sale file loaded into its system, which is known as the "Load Data." (*Id.*). This Load Data is provided to PRA at the time the account is purchased (*Id.*). The Load Data contains the telephone number and other contact information for the consumer, as well as other specific account-related details (*Id.*). PRA received the Load Data on Hagood's account from Citibank in the ordinary course of its business practice and maintained the Load Data in its internal system of record (*Id.*). Hagood did not give PRA his personal cell phone number ending in -8643 (Doc. 47-5).

PRA placed 355 total telephone calls using its Avaya Proactive Contact System ("Avaya") to Hagood's cell phone number ending in -8643 (*Id.*). PRA owns four Avaya

dialers (Doc. 36-3). The Avaya dialer used to make the calls in this case was a predictive dialer, and the calls were dialed using Avaya's "predictive dialing mode." (Doc. 33).

Predictive dialing is a computerized method for automatically dialing stored lists of telephone numbers commonly used in call center operations. Predictive dialing provides the capability to "predict" the availability of call center agents that can respond to the outbound calls that have been dialed by the predictive dialing system and answered by the called party (Doc. 47-3 at ¶ 18). Predictive dialing systems like Avaya store telephone numbers to be dialed by the system. (*Id.* at ¶ 32).

When PRA's agents use the Avaya system, the technology delivers to each agent certain telephone numbers from the computer file that identifies accounts with an increased likelihood of being collected (*Id.*). The numbers are processed into a calling list, which the Avaya system prepares for dialing by ensuring PRA calls the phone numbers in permissible time frames (*Id.*). The Avaya dialer has logic built into it regarding how to time calls so that an agent is available when a call is answered (Doc. 47-2). It also uses an algorithm to constantly make adjustments and control how many calls the system will make at any given time (*Id.*).

Once the calling lists are processed, the records associated with the numbers in the calling lists are placed into a "job." (*Id.*). When a PRA representative begins calling a debtor, the representative is electronically provided access to one of the jobs that has been previously created based on set criteria (*Id.*) The accounts within these jobs are then called by representatives who contact debtors about paying their debts (*Id.*).

Joshua Cherkasly, Vice President of Production at PRA, attested that PRA's Avaya technology does not have the capacity to produce or store telephone numbers using a random or sequential number generator, nor has it ever had that functionality (Doc. 36-3 at ¶ 48). If PRA wanted to dial phone numbers using a random or sequential number generator, it would have to change the current programming of the technology (*Id.* at ¶ 49). Avaya licenses the software to PRA, however, and PRA is not permitted to make changes to the software under the maintenance agreement between Avaya and PRA (Doc. 36-2). Indeed, Avaya's software is written in binary code, making it next to impossible for anyone outside of Avaya to reverse engineer and edit (*Id.*) As configured, PRA's Avaya dialers can only dial phone numbers contained in a list created through PRA's collection system (*Id.*). That list is made up of phone numbers associated with debtor accounts that PRA owns (*Id.*).

PRA has moved to exclude the opinions of Hagood's expert (Doc. 39), as well as for summary judgment (Doc. 36), arguing that Hagood cannot meet his burden of showing the Avaya technology PRA used to call his cell phone had the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers," the definition of an "automatic telephone dialing system" (ATDS) under the TCPA. 47 U.S.C. § 227(a)(1). Because the record demonstrates PRA's technology lacks the statutorily proscribed capacity to call random or sequentially generated numbers, PRA argues, Hagood's claim must fail as a matter of law. Hagood has filed a cross-motion for summary judgment, arguing that the Avaya predictive dialer used by PRA does qualify as an ATDS under the TCPA (Doc. 46). The

parties further move for summary judgment on the issue of whether Hagood consented to the phone calls. Because the Court finds that PRA did not use an ATDS as defined by the TCPA, however, it need not reach the issue of consent.[1]

## I.  PRA's Motion to Exclude Plaintiff's Expert Witness

The Court first addresses PRA's motion to exclude the opinions of Hagood's expert witness, Randall A. Snyder. In his declaration, Snyder, an independent telecommunications technology consultant, opines that the Avaya Proactive Contact Dialer has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers (Doc. 40-1 at ¶¶ 10, 33, 42). Yet, PRA argues, Snyder offers no factual support for this opinion (Doc. 40).

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[1] And because Hagood's motion to strike is directed to evidence related to the issue of consent, the motion to strike is denied as moot.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 589). In determining whether expert testimony is both relevant and reliable, courts in the Seventh Circuit perform a three-step analysis: "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education,' FED. R. EVID. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing FED. R. EVID. 702).

"[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The district court possesses "great latitude in determining not only *how* to measure the reliability of the

proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). "The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (quotation omitted). Said another way, there must be a "rational connection between the data and the opinion." *Id.* (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013)).

Here, there is no rational connection between the factual data and Snyder's opinion that the Avaya technology used by PRS can store or produce phone numbers using a random number generator. Snyder testified that only basis for his opinion that the Avaya system can store or produce phone numbers using a random number generator is the ability of the Windows operating system to generate random numbers (Doc. 40-2 at pp. 5, 9). He further testified, however, that the same could potentially be said for *any* dialing system hosted on a computer with a Windows operating system (*Id.* at p. 6). He did not testify that the Avaya technology itself could generate random numbers to dial.

Snyder's "overbroad, generalized assertions" regarding a system's ability to generate random numbers just because its operating system has that capability has been rejected before, notably by the Third Circuit Court of Appeals. In *Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116, 120 (3d Cir. 2018), the Third Circuit found Snyder's declaration speculative and lacking "any explanation of how the Email SMS System actually did or could generate random telephone numbers to dial." *Id.* Because Snyder's

declaration did "not shed light on the key factual question actually at issue in this case—whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers," it lacked relevance and was therefore properly excluded by the district court. *Id.* at 121. Likewise, Snyder's declaration in this case fails to establish that the Avaya technology can store or produce phone numbers using a random number generator.

Snyder does, however, suggest that the Avaya equipment is capable of sequential number generation. He bases this opinion on his belief that Avaya can take a preexisting calling list of telephone numbers, re-sort those telephone numbers, and generate a new "sequence" of telephone numbers based on that re-sorted list (Doc. 37-2 at p. 6). But this testimony does not establish that the Avaya technology can store or produce telephone numbers using a "sequential number generator" as that term is used under the TCPA. Sequential number generation "refers to the numbers themselves rather than the manner in which they are dialed." *Dominguez v. Yahoo, Inc.*, 629 F. App'x 69, 372 (3d Cir. 2015); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 725 (N.D. Ill. 2011) ("As we understand these terms, . . . 'sequential number generation' means (for example) (111) 111–1111, (111) 111–1112, and so on."). The fact that the Avaya program re-ordered lists of pre-programmed telephone numbers does not make it a sequential number generator. *See also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) (AT&T's system did not store or produce numbers using a sequential number generator when it exclusively dialed numbers stored in a customer database).

Because Snyder's opinion that the Avaya Proactive Contact Dialer has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers, is not based on sufficient facts or data, the Court finds it is unreliable. Accordingly, PRA's Motion to Exclude Plaintiff's Expert Witness (Doc. 39) is granted.

## II.    Cross-Motions for Summary Judgment

Having determined there is no evidence that the Avaya predictive dialer used by PRA has the capacity to generate random or sequential telephone numbers, the Court now turns to the parties' cross-motions for summary judgment. The Court reviews the motions under the familiar standard: summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014).

The TCPA protects individual consumers from receiving intrusive and unwanted phone calls. *Mims v. Arrow Fin. Servs.*, LLC, 565 U.S. 368, 372, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). Specifically, the Act prohibits the use of an "automatic telephone dialing system" to call or text any cellular phone without the prior consent of the recipient, with some exceptions. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) (citing 47 U.S.C. § 227(b)(1)). An "automatic telephone dialing system" (ATDS) is defined as "equipment that has the capacity (A) to store or produce telephone numbers to be called,

using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(b)(1). The TCPA does not prohibit all calls, only those made without consent and using an ATDS or an artificial or pre-recorded voice.

Hagood argues that this definition of an ATDS should be construed to cover any device that automatically dials a list of stored numbers *en masse*, relying on the Seventh Circuit's 2017 decision in *Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017). In that case, the Seventh Circuit adopted the view expressed by the Federal Communication Commission in 2015 that "predictive dialers, which have the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," meet the ATDS definition. *Id.*

Since that time, however, the interpretation of the TCPA's definition of an ATDS has evolved. In 2018, the D.C. Circuit struck down the 2015 FCC interpretation in *ACA International v. FCC*, 885 F.3d 687, 695 (D.C. Cir. 2018). And on January 27, 2020, the Eleventh Circuit held a device is not an ATDS if (1) it does not use randomly or sequentially generated numbers or (2) it requires human intervention. *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1304-05 (11th Cir. 2020). The Seventh Circuit has now adopted the Eleventh Circuit's approach.

In *Gadelhak v. AT&T Services, Inc.*,[2] decided last month, the Court of Appeals held that the phrase "using a random or sequential number generator" modifies "store" and "produce," defining the means by which either task must be completed for equipment to

---

[2] PRA's motions for leave to file supplemental authority (Docs. 77, 79) are **GRANTED**.

qualify as an "automatic telephone dialing system." *Gadelhak*, 950 F.3d at 464. Thus, if the equipment lacks the capacity to either store or produce telephone numbers using a random or sequential number generator, then it does not qualify as an ATDS. *Id*. at 469.

Here, there is no evidence that the Avaya Proactive Contact Dialer used by PRA has the capacity to store or produce random or sequential telephone numbers and dial them. And the Avaya system is not an ATDS merely because it reorganizes pre-programmed telephone numbers into a list in a different sequence. Accordingly, because there is no genuine dispute that PRA did not use an ATDS to call Hagood's cell phone, it did not violate the TCPA. PRA is entitled to judgment as a matter of law.

### CONCLUSION

For these reasons, the Motion to Exclude Plaintiff's Expert Witness (Doc. 39) and the Motion for Summary Judgment filed by Defendant Portfolio Recovery Associates, LLC (Doc. 36) are **GRANTED**. The Motion for Summary Judgment (Doc. 46) filed by Plaintiff Edward Hagood is **DENIED**. Plaintiff's Motion to Strike Portions of the Summary Judgment Evidence of Defendant (Doc. 50) is **DENIED as moot**.

**IT IS SO ORDERED.**

**DATED:** March 19, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**